UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | |
| **DEBORAH ANN CHURCH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Civil Action No. |
| v. ) | 10-30236-FDS |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON
THE PLEADINGS AND DEFENDANT'S MOTION FOR AN
ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security Administration denying the application of plaintiff Deborah Ann Church for Social Security Disability Insurance ("SSDI") benefits. The Commissioner determined that plaintiff's physical conditions were not disabling before August 19, 2008. He also concluded that plaintiff's depression and anxiety were not severe impairments.

Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. §§ 405(g) and 1383(c)(3). Specifically, plaintiff disputes the Commissioner's findings that from August 27, 2007, to August 19, 2008, her depression and anxiety were not severe impairments, and contends that the Commissioner erred in concluding that her Residual Functional Capacity ("RFC") permitted her to perform light work.

Pending before the Court are plaintiff's motion for judgment on the pleadings and

defendant's motion for an order affirming the decision of the Commissioner.  For the reasons stated below, the decision of the Commissioner will be affirmed and the motion for judgment on the pleadings will be denied.

## I.     Background

The following is a summary of the evidence in the administrative record.

### A.     Educational and Occupational History

Plaintiff Deborah Ann Church was born on December 19, 1953.  (Tr. 103).  She attended an accelerated college program from 2004 to 2006 and obtained a bachelor's degree in human services, graduating at the top of her class.  (*Id*. at 27, 487).  She has held a number of jobs, including home health aide, resident assistant, van driver, and foster parent.  (*Id*. at 108, 27).

From 1992 to 2001, Church owned a van transportation business and worked as a van driver, transporting disabled individuals.  (*Id*. at 30).  In 2002, she worked for less than a year as a resident assistant in an assisted-living facility.  (*Id*. at 29).  From 2003 to 2008, she worked as a home health aide.  (*Id*. at 487).  In this capacity, she performed light housework, such as laundry, grocery shopping, and assisting individuals with their personal care.  (*Id*. at 108).  She stopped working as a home health aide after an on-site accident in 2002 left her with a shoulder injury that later migrated to her fingertips and caused her fingers to "go dead on her." (*Id*. at 38, 226).  She has not been employed since she resigned from that job in January 2008.  (*Id*. at 487).

Over the years, Church has intermittently served as a foster parent.  (*Id*. at 27).  Since August 27, 2007,  the alleged date of the onset of her disability, she has primarily served as a foster parent to one child, a 14-year-old boy who lived with her for a total of three years and

suffered from an emotional condition. (*Id*. at 27-28).[1]

### B.  Medical History

#### 1.  Shoulder, Arm, Thumb and Neck Pain

On September 3, 2002, Church was assisting a patient on a Hoyer lift when she felt a pain in her right shoulder. (*Id*. at 226). Since then, she has had continual problems lifting, elevating, and lying on her right arm. (*Id*. at 13, 226, 487, 521). She also contends that she suffers from chronic pain in her right thumb to right shoulder and neck pain. (*Id*.)

On May 20, 2003, Dr. Khaled Instrum, M.D., performed an arthroscopic subacromial decompression and acromioplasty (a surgical procedure) on Church's right shoulder to lessen her pain. (*Id*. at 204). Dr. Instrum made a preoperative diagnosis of a right rotator-cuff impingement. (*Id*. at 206). While an MRI of her shoulder revealed tendinosis in the area, Dr. Instrum noted that "[she] has never demonstrated any evidence of a rotator cuff tear." (Tr. 204, 206). She returned to her job as a home health aide approximately three months after the surgery. (*Id*. at 232, 339).

On June 10, 2003, Church commenced physical therapy three times per week for four weeks at Holyoke Hospital for right shoulder pain and de Quervain's tendinitis in her right wrist. (*Id*. at 141, 151).[2] The physical therapist described her rehabilitation potential as "good" and stated that she reported a 50% improvement in the afflicted areas since beginning physical therapy. (*Id*. at 146, 166). On several occasions, Church indicated that the pain had spread to the

---

[1] The foster child left her care in January 2010. (Tr. 28).

[2] De Quervain's tendinitis is an inflammation of the tendons on the thumb side of the wrist. *See* De Quervain's Tendinitis, MAYO CLINIC, (Jan. 30, 2012), http://www.mayoclinic.com/health/de-quervains-tenosynovitis/DS00692.

right side of her neck.  (*Id*. at 159, 164).  On September 11, 2003, she was discharged from physical therapy, but the therapist was unable to evaluate her progress formally because "patient stopped coming."  (*Id*. at 151).

On September 22, 2004, Church again had her right shoulder x-rayed.  (*Id*. at 311).  Dr. Patrick Barnett, M.D., described the shoulder as "normal," with AP radiographies of the shoulder in internal and external rotation revealing no significant bony or soft tissue abnormalities.  (*Id*.)

On December 14, 2004, Church underwent a nerve conduction study and needle examination after complaining that her left arm, legs, and right foot "go dead and stay dead."  (*Id*. at 313).  The results of both tests were normal.  Dr. Carmel Armon, M.D., M.H.S. concluded that "there [was] no electrophysiologic evidence of a left cervical radiculopathy, plexopathy or upper extremity peripheral neuropathy," although "a small fiber neuropathy [could] not be excluded by this study."  (*Id*.)

On August 28, 2007, Church visited the Holyoke Health Center due to pain and discomfort in both wrists.  (*Id*. at 192).  Dr. Yeshvant Talati, M.D., found that she did not have any deformity or abnormality and noted that "she had good grasp bilaterally though after she grasped my fingers she experienced some discomfort."  (*Id*. at 192).  Dr. Talati diagnosed bilateral wrist pain most likely related to tendinitis, and prescribed bilateral wrist splits to be used intermittently.  (*Id*.)

On October 29, 2007, Dr. Catherine Spath, M.D., examined Church and ordered a nerve conduction study and x-rays.  (*Id*. at 202).  While Dr. Spath detected some arthritis in Church's thumb, she concluded "[Church] is trying to get a new job and that is fine.  I do not have any way of really justifying not being able to go back to work because she said that she feels a little bit

4

better having been doing the therapy, which I think she should continue . . . she is quite mobile." (*Id*.). Dr. Spath cleared Church to return to work on November 19, 2007, but advised that she limit heavy or repetitive lifting. (*Id*. at 328).

On November 7, 2007, Church's hands, neck, and right shoulder were x-rayed pursuant to Dr. Spath's order. (*Id*. at 210- 213). Overall, her left hand was described as "normal" with no observed fracture or dislocation. (*Id*. at 210). The x-ray of her right hand revealed mild osteoarthritis but was otherwise normal. (*Id*. at 211). Her neck x-ray displayed evidence of degenerative cervical spondylosis and disc space narrowing at C5-C6 and C6-C7, mild right-sided neural foraminal narrowing at C5-C6, and mild left-sided neural foraminal narrowing at C6-C7. (Tr. 212). An MRI of her right shoulder showed tendinosis of the rotator-cuff tendon and no evidence of a rotator-cuff tear. (*Id*. at 213).

On November 19, 2007, Dr. Spath conducted a follow-up examination. (*Id*. at 201). Church complained of tightness and soreness in her neck and right shoulder, as well as pain at the base of the thumb with some occasional snapping. (*Id*.). Dr. Spath found that Church "presented with some complaints of paresthesias, but her nerve conduction study did not reveal any compressive or radicular problems." (*Id*. at 200). Dr. Spath observed that she had pain consistent with arthritic-type changes at the base of the thumb and some mild tendinitis in the hand. (*Id*.). As to her thumb, Dr. Spath found some tenderness at its base, some crepitus, and observed that she had "a negative Phalen's [test and a] negative Tinel's [sign]." (*Id*. at 201).[3]

---

[3] A Phalen's test is a "maneuver in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within sixty seconds may be indicative of carpal tunnel syndrome." STEDMAN'S MEDICAL DICTIONARY 239570 (27th ed. 2000). A Tinel's sign is a "a sensation of tingling, or of "pins and needles, felt at the lesion site or more distally along the course of a nerve when the latter is percussed, which indicates a partial lesion or early regeneration in the nerve." *Id*. at 373770.

Dr. Spath concluded that "the main problem is arthritis at the base of the thumb, which is not infrequent in women over the age of 40," and informed Church that this condition could be treated with cortisone injections. (*Id*.). She noted that Church displayed some evidence of de Quervain's tendinitis, although the signs were "not prominent." (*Id*.). With regard to her shoulder and neck, Dr. Spath suspected that some of the arm pain was long-standing due to Church's history of shoulder problems and thought that she might have some degree of neck arthritis. (*Id*.). She recommended continued physiotherapy and suggested that Church consider epidural injections if the therapy no longer helped. (*Id*.).

Church attended physical therapy at Holyoke Medical Center from approximately September 5, 2007, through January 8, 2008. (*Id*. at 342- 391). Her physical therapy records state that upon beginning treatment, her long-term goals included "[t]olerating 15 minutes of light housekeeping (sweeping, making beds)" and mastering relaxation techniques. (*Id*. at 391). Her dexterity and coordination were described as "impaired" and her rehabilitation potential assessed as "fair," with the physical therapist noting "patient [has] many life stressors contributing to tightness." (*Id*. at 381).[4] Her physical therapy records for November 11, 2007, indicate that although she was currently on leave from her job as a home health aide, she had applied for a case manager position that would require her to work between 20 and 30 hours a week. (*Id*. at 380). Her physical therapy records for December 12, 2007, indicate that while Church had returned to her job as a home health aide, she told her physical therapist that returning to work had worsened her condition. (*Id*. at 348). On December 28, 2007, she told her physical therapist, "I have a

---

[4] Church's physical therapy records repeatedly note that she was negatively affected by family and external "stressors," and would benefit from counseling or an increased support system. (Tr. 358, 361, 366, 370, 372).

6

baby in foster care now, so I'm quitting my [certified nursing assistant] job next week." (*Id*. at 345).

On June 10, 2008, Church was examined by Dr. Daniel Dress, M.D. (*Id*. at 433). Dr. Dress noted "there is no evidence of acute arthritis in the arms or legs," and "Tinel's sign is negative." He diagnosed right upper extremity pain, de Quervain's tendinitis, and possibly cervical radiculopathy and carpal tunnel syndrome. He also concluded that Church had limitations as to heavy lifting or limitations of the right hand. (*Id*. at 434).

At her administrative hearing on May 5, 2010, Church testified that she took only over-the-counter medications and muscle relaxants for her physical symptoms, because she feared becoming addicted to pain medication. (*Id*. at 35).

### 2. **Mental Health**

In addition to her physical afflictions, Church has a history of adjustment disorder with anxiety and depression. (*Id*. at 11). She has taken medication for depression for the past fifteen years. (*Id*. at 34). She has described to doctors "a miserable, chaotic childhood accompanied by both deprivation and abuse, both physical and sexual." (*Id*. at 486). She has received counseling at times over the years, beginning as a child, and has said that she benefitted from these sessions. (*Id*. at 487).

On February 3, 2009, Dr. W. Eugene Goldwater, M.D., performed a consultative examination. (*Id*. at 488). Dr. Goldwater noted that both of Church's parents and her brother had died over the last few years but stated that she denied having serious depression. (*Id*.). He further stated that while she reported some symptoms of panic attacks in crowded areas and tried to avoid them, her anxiety did not otherwise limit her daily activities. (*Id*.). He concluded that

while she may have a generalized anxiety disorder, her primary disability was physical. (*Id.*).

On March 5, 2009, Dr. Brian O'Sullivan, Ph.D., assessed Church's psychological condition from August 27, 2007, to March 5, 2009, based on the record evidence. (*Id.* at 490). While he found that she had depression NOS and anxiety NOS, he concluded that these impairments were not severe. (*Id.* at 490, 493, 495, 500).[5] He further indicated that her depression and anxiety did not restrict her daily living activities and that she experienced only mild difficulties in maintaining social functioning. (*Id.* at 500).

At her hearing on May 5, 2010, Church testified that she has not had any psychiatric hospitalizations and had not recently received psychological counseling. (*Id.* at 35-36).

### C.     Daily Activities

Church lives alone, but over the years various foster children have lived with her while in her care. (*Id.* at 27). She can stand and walk for long periods of time. (*Id.* at 41). She is able to cook light meals for herself, although she has difficulty handling pans and heavier items, and she also washes her own clothes and bathes, grooms, and dresses herself. (*Id.* at 13, 36). At her hearing, she testified that she could not lift more than a cup of coffee due to right-arm and shoulder pain. (*Id.* at 13). She also testified that daily chores that involve repetitive motions aggravate her tendinitis; she must proceed slowly and ask for help in order to complete them. (*Id.* at 43). She has trouble gripping objects with her right hand and thumb, has difficulty opening jars, and must write slowly. (*Id.* at 13). She often does not sleep well due to chronic pain and, as a result, feels fatigued during the day. (*Id.* at 487).

---

[5] Specifically, Dr. O'Sullivan found that her "symptoms of mild depression and anxiety which can occasionally break concentration are about life challenges and are credible, though not associated with any significant limits to functioning." (Tr. 502).

Church handles her own finances and is able to drive. (*Id*. at 36, 488). While she does not participate in any clubs or social organizations, she maintains an active lifestyle and has been described by her doctors as "constantly on the go" and "quite mobile." (*Id*. at 37, 487-88, 502, 202). She tries to exercise daily and has some involvement with family and friends on the weekends. (*Id*. at 488). She experiences symptoms of depression and anxiety as a result of her financial situation, and has stated that she has difficulty concentrating and remaining focused. (*Id*. at 42, 43).

### D. Procedural History

On September 12, 2007, Church applied for SSDI benefits, contending that she had been unable to work since August 27, 2007, due to tendinitis in her wrists, right thumb, and right rotator cuff. (*Id*. at 58, 103, 107). On June 19, 2008, the Social Security Administration denied her claim. (*Id*. at 60-62). On August 17, 2008, she requested that her claim be reconsidered. (*Id*. at 88). The SSA found that she was disabled as of December 19, 2008, which differed from her alleged onset date of August 27, 2007. (*Id*. at 63).

After obtaining counsel, Church requested a hearing, which was held before an Administrative Law Judge on May 5, 2010. (*Id*. at 21). On July 10, 2010, the ALJ issued a partially favorable decision concluding that she was not disabled prior to August 19, 2008, but had become disabled on that date and continued to be disabled thereafter. (*Id*. at 1, 4, 15). The ALJ's decision was forwarded to the Decision Review Board and became final when the Board did not act on the claim within 90 days. (*Id*. at 1).

Church filed an action with this Court on December 10, 2010, seeking reversal of the Social Security Commissioner's decision as to the period from August 27, 2007, to August 19,

2008. She has moved for judgment on the pleadings, and the SSA has cross-moved for an order affirming the Commissioner's Decision.

## II. Analysis

### A. Standard of Review

Under § 205(g) of the Social Security Act, this Court has "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The findings of the Commissioner as to any fact, however, shall be conclusive if supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Sec'y of Health & Human Srvcs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Srvcs.*, 826 F.2d 136, 144 (1st Cir. 1987). It is the responsibility of the Commissioner, not the courts, to evaluate credibility, draw inferences from the evidence, and resolve conflicts in the evidence. *Rodriguez*, 647 F.2d at 222. While the ALJ must take medical evidence, "the determination of ultimate disability is for [the Commissioner], not for the doctors or the courts." *Lizotte v. Sec'y of Health & Human Srvcs.*, 654 F.2d 127, 128 (1st Cir. 1981). For that reason, this Court must affirm the Commissioner's denial "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Srvcs.*, 819 F.2d 1, 3 (1st Cir. 1987).

### B. Standard for Entitlement to Disability Insurance Benefits

In order to qualify for disability insurance benefits, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act. The Act defines the term

"disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only her past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Srvcs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").  At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  In making that determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience.  20 C.F.R. § 404.1560(c).

### C. The ALJ's Findings

To determine whether plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability.  (*Id.* at 10).  At the second step, the ALJ found that her right-arm and shoulder osteoarthritis, cervical degenerative disc disease, and de Quervain's tendinitis of the right thumb were severe impairments.  (*Id.*)  At step three, the ALJ found that she did not have an impairment or combination of impairments that met or medically equalled an entry on the list of impairments set forth in the regulations.  (*Id.* at 12).  At step four, the ALJ ruled that she had the RFC to perform light exertional work.  (*Id.*)  Specifically, the ALJ found that she was limited to less-than-occasional grasping, pinching, and twisting with her right hand and arm; that she must avoid overhead reaching and lifting with the right arm; that she must avoid heights, ladders, ropes, and scaffolds, as well as extreme cold and vibration; and that she was limited to simple, unskilled tasks, due to distractions from pain.  (*Id.* at 12).  In light of that RFC assessment, the ALJ concluded that plaintiff could not perform her past

relevant work as a home health aide or van driver. (*Id*. at 14). At step five, the ALJ found that plaintiff was not disabled prior to August 18, 2008. (*Id*.) However, on August 19, 2008, plaintiff's age category changed; the ALJ then considered her age, education, work experience, and RFC in the disability analysis. (*Id*.) The ALJ found that there were no jobs that existed in significant numbers in the national economy that she could perform, and concluded that she was disabled pursuant to Medical-Vocational Rule 202.06. (*Id*. at 15) Accordingly, the ALJ determined that she was not disabled prior to August 19, 2008, but became disabled on and after that date. (*Id.*).

### D.     Plaintiff's Objections

In support of her motion for judgment on the pleadings, plaintiff contends that as to the period from August 27, 2007, to August 19, 2008, (1) the ALJ erred by concluding that her depression and anxiety were not severe impairments, and (2) that the ALJ's assessment of her RFC was not supported by substantial evidence. For the reasons that follow, the decision of the Commissioner will be affirmed.

#### 1.     Whether the ALJ Erred in Concluding That Plaintiff's Depression and Anxiety Were Not Severe Impairments

Plaintiff first contends that the ALJ erred in concluding that her depression and anxiety imposed no more than minimal functional limitations and therefore were not severe impairments. (Pl. Mem. at 6). Specifically, she asserts that the medical evidence and testimony support a finding that her depression and anxiety were severe impairments of such a degree that they should have lowered her RFC. (*Id*.). The Commissioner argues that the record supports the ALJ's finding that plaintiff's depression and anxiety were not severe impairments. (Def. Mem. at 9).

Step two of the sequential evaluation process requires the Commissioner to determine whether a claimant possesses a "severe" impairment. 20 C.F.R.§§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities, which in turn is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R.§§ 404.1520(c); 1521(b). The claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice. 20 C.F.R.§§ 404.1508, 416.908. A mere diagnosis is insufficient to establish that an impairment is severe as defined by the regulations. 42 U.S.C. § 423(d)(2)(B).

The ALJ's finding that plaintiff's anxiety and depression were not severe impairments is supported by substantial evidence. Plaintiff herself testified at her administrative hearing that "[her] physical abilities, for the most part" were what prevented her from working. (Tr. 32). She also testified that she had not recently received mental-health counseling and had never been hospitalized for mental-health issues. (*Id*. at 35-36). During her February 3, 2009 examination by Dr. Goldwater, she denied serious depression in spite of taking anti-depression medication, leading him to conclude that while she may have a generalized anxiety disorder, her primary disability was physical. (*Id*. at 488). Dr. Goldwater also concluded that her anxiety disorder did not limit her daily activities except for causing her to avoid crowds, which supports the ALJ's finding that her anxiety and depression imposed no more than minimal functional limitations. (*Id*.)

The March 5, 2009 examination by Dr. O'Sullivan lends additional support to the ALJ's finding. While Dr. O'Sullivan indicated that plaintiff had anxiety and depression, he concluded

14

that those impairments were not severe. (Tr. 490). His psychiatric review specified that she had no restriction of activities of daily living due to her mental health. (*Id*. at 500). He also noted that she had not experienced episodes of decompensation of extended duration, and had only mild difficulties in maintaining social functioning, concentration, persistence, or pace. (*Id*.). He concluded that her symptoms of mild depression and anxiety were due to life challenges and did not significantly impair her ability to function.

In summary, substantial evidence supports the ALJ's decision that plaintiff's anxiety and depression were not severe impairments.[6]

### 2. **Whether the ALJ's Conclusion as to Plaintiff's Residual Functional Capacity Was Supported by Substantial Evidence**

Plaintiff next contends that the ALJ's finding that she was able to perform light work prior to August 19, 2008, was not supported by substantial evidence. In essence, plaintiff contends that the pain resulting from her severe impairments would cause her to be off-task in a work environment. (Pl. Mem. at 8-9). In particular, she disputes the ALJ's RFC assessment that she could perform light work involving less-than-occasional grasping, pinching, and twisting with the right hand/arm. The Commissioner contends that the ALJ made the necessary findings to support her assessment of plaintiff's RFC and credibility by examining her medical records, daily activities, and medications, and that the ALJ properly considered inconsistencies in these records in finding her to be less than fully credible. (Def. Mem. at 11-13).

---

[6] While plaintiff contends that Dr. Victoria Noble's diagnosis that plaintiff had an adjustment disorder supports a finding that her depression and anxiety were severe impairments, such diagnoses alone do not establish severe impairments. 42 U.S.C. § 423(d)(2)(B). Symptoms of depression and anxiety, absent evidence of functional loss, do not establish disability for purposes of the Social Security Act. *Sitar v. Schweiker*, 671 F.2d 19, 20-21 (1st Cir. 1982). Moreover, nothing in the record indicates that plaintiff sought mental health counseling after receiving Dr. Noble's referral.

"The credibility determination of the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Srvs.*, 829 F.2d 192, 195 (1st Cir. 1987). Where there are inconsistencies in the record, the ALJ may discount subjective complaints of pain. *Underwood v. Bowen*, 807 F.2d 141, 143 (8th Cir. 1987).

The Court concludes that the ALJ's RFC determination that plaintiff can perform light work is supported by substantial evidence. While plaintiff has stated that she has difficulty gripping things with her right hand, opening jars, and writing, her testimony that she was unable to lift no more than a cup of coffee is inconsistent with other record evidence. For example, in a note dated October 29, 2007, Dr. Spath authorized plaintiff to return to work, noting that she was "quite mobile" and advising her to limit heavy or repetitive lifting. (*Id.* at 328). On June 10, 2008, Dr. Dress found that she had no signs of acute arthritis in the arms or legs and concluded that she had limitations as to heavy lifting or limitations of the right hand. (*Id.* at 434).

The Court also notes that plaintiff is able to independently care for her personal needs, as well as serve as a foster parent. She lives alone and can prepare light meals, bathe, dress, and groom herself without significant difficulty. (*Id.* at 27, 13, 36). While she alleges an onset of disability date of August 27, 2007, a therapy note dated November 9, 2007, indicates that she had applied for a new job as a case manager in which she would work 20 to 30 hours per week. That application contradicts her assertion that she was unable to perform light work during the disputed period. Further, plaintiff stated to her physical therapist on December 28, 2007, that she was resigning from her position as a nursing assistant because she had a baby in foster care.

(*Id*. at 345). The physical requirements of caring for a baby, which include frequent lifting, are clearly inconsistent with her claim that she cannot lift more than a cup of coffee. Finally, plaintiff testified at her hearing that she took only over-the-counter medications and muscle relaxants for her physical symptoms, which supports the ALJ's rejection of her assertions of disabling pain.[7]

In summary, the ALJ's conclusion that she retained the RFC to perform light work prior to August 19, 2008, is supported by the evidence and will not be overturned.

### III.    Conclusion

For the foregoing reasons, the defendant's motion for an order to affirm the final decision of the Commissioner is GRANTED, and the plaintiff's motion for judgment on the pleadings reversing the final decision of the Commissioner is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  February 2, 2012

---

[7] *See Albors v. Sec'y of Health & Human Servs.*, 817 F.2d 146, 147 (1st Cir. 1986) (holding that the fact that the claimant did not take medication stronger than aspirin contributed to a finding supporting the ALJ's rejection of claimant's allegations of disabling pain).